Good morning, Your Honors. Deputy Attorney General David Cook for the appellant, Warden Lamarque. In this case, the issue is whether Petitioner received ineffective assistance of counsel at trial when counsel's question of Petitioner during the defense case was held to open the door to the marital communications privilege. And as I've set forth in my briefs, the three errors made by the district court in this case were finding that the attorney did not make a tactical decision at trial, finding that the tactical decision, if one was made, was not reasonable, and that Petitioner was prejudiced by counsel's conduct. Turning first of all to the reason, well, as to the tactical decision, Your Honor, and this also is set forth in the brief, the state court in this, as to this point, made a credibility determination, the trial counsel's declaration statement, that he made a mistake in his questioning, the mistake being that opened the door to the marital communications privilege being waived. There was a credibility determination made by the state court. That credibility determination should be upheld in the federal court. And moreover, Petitioner has cited no evidence that had not already been presented to the state court in assessing that factual finding. And the, the credibility finds the first trial court, is that what you're suggesting? Yes, Your Honor. You know, it's hard to read all through this, the whole evolution of this discussion, and the, what, I realize we're just looking at the contemporaneous record and it's, we don't get the body language and all of that, and I appreciate the trial judge sitting there. He did seem a little waffly a little bit after saying that he didn't think there was ineffective assistance or a mistake. But just reading the whole evolution of these arguments, it he asked the question of Gaines on cross and gets warned off. That's true. The next time when it comes up then is with the, with his own client on the stand, and he seems to throughout think, be operating on the misapprehension, that you can segment conversations so that whatever he may have asked Gaines about, about the incident with the dog and the cleanup, when he was, as I recall now, I may be misremembering, but I think what triggered the whole waiver ruling was when he then asked Edwards about what did he, first of all, he has his client testify that she yelled at him, what are you doing, hollered at him. So she's already given, he's already now testified to one half the conversation. The DA doesn't object right at that point, but then when he asks his client, what did you tell her? Then, of course, comes the objection, the waiver ruling and all of that. It was clear, it seems to me from the record that counsel seemed to think that that would not, if any, if it would waive anything, it would just waive that segmentable, in his mind, conversation, that he wasn't opening the door to anything that would have opened up the testimony, which is really the vital testimony, which all happened on the first day. It just really reeks of the guy just didn't understand what the heck the marital privilege and waiver was all about. Well, Your Honor, I believe that you're correct to a point that, well, first of all, the trial counsel did assert an argument at trial that the privilege could be waived as to some matters, but not as to other matters. And I believe he made, and I believe opposing counsel has made that point as well, that that was a position taken by trial counsel at trial. And to the extent that trial counsel may have been misinformed of the scope of the marital communications privilege is not exactly the precise issue. As found by the state trial court, the tactical decision made by trial counsel, which is the subject of the IAC claim, was that he was trying to get as much favorable evidence into the record on behalf of the defense without waiving it. I don't disagree with that. I think he was. He clearly was trying to get in Edwards' view of the conversation, you know, his side of the conversation, to respond to Gaines having testified about certain things. He makes that clear. But what I'm trying to grapple with, and I appreciate your comments on it, is that he may have been making tactical, you know, come up close to the line, but he had no clue of what the governing law was. He just didn't know the relevant case. He didn't come in when he was asked to. He came up with nothing when he came in the next day before the trial judge to explain what he was doing. He just had a flat-out, clear misunderstanding of the law. So what do we do with that if you've got a counsel who is, as a matter of legal understanding, plainly incompetent, and then builds a tactical strategy on that? Well, I disagree with Your Honor to find that he's plainly incompetent. And again, as found by the state court, and in your recitation of the facts, Your Honor, you even pointed to some successful attempts by Petitioner's counsel in the first trial of getting in favorable communications. So I understand he did it, but he did it on a misunderstanding of what kind of fire he was playing with. He seemed to think he could take in Conversation A on Day 2 and not open up testimony relating to Day 1, which is the real damaging stuff. So... Was there any law at the time that said he couldn't do that? I don't believe... Well, other than the case that he cited Worthington and the argument that he made based on Worthington... Yeah, I mean, Worthington was the universe at the time, right? Right. And I don't believe there was any other authority out there that supported his position at the time. And certainly we argued... Well, or that opposed it. That's my question. Was there any law out there at the time that said it was plainly incompetent to make an argument that if you ask about a conversation that occurs on one day, you're opening the door to a conversation that occurred the day before? Well, if I understand your question correctly, Your Honor, let me answer it in this way. I don't believe that there was any authority, any other authority out there, certainly none was cited, supporting his position of the partial waiver. In fact, the DA that morning came in and cited Jefferson, cited McCormick, cited... Well, I have a completely different view of the transcript. And if you don't mind, I'm just trying to ask a simple question that... And then you can have the rest of it. My question is, was there any authority in California at the time that said if you ask a question about a conversation that occurs on one day, you are waiving the privilege with respect to a different conversation on a different topic that occurred on a different day? I don't know of any such case that was on the books at that time. All right. Thank you. But if I may continue on, the earlier questions regarding counsel's misapplication of the scope of the marital communications privilege, that goes to the reasonableness prong of Strickland. And that question, whether trial counsel was reasonable at the time he asked the very question, has to be assessed as of the time the question was asked. And at that time, contrary to what the district court believed, the circumstantial evidence of Petitioner's guilt presented by the prosecution at the time the question was asked was very, very strong, if not overwhelming. There was evidence of Petitioner's motive for the killing, his access to weapons, one of which was test fired to be consistent with one of the actual murder weapons. The location of the body of the victim found by Petitioner's place of business. The unexplained or I should say the bizarre conduct of scrubbing his hands with the laundry detergent. His prior threat to the victim, which included the words, I'll kill you. And his further confrontation with Mr. Melton, an associate of the victim, where he says, where he's denied or where in the phone conversation at the end of which he says words to the effect, if you don't leave me alone, I will quote unquote F you up too. And so all of that evidence taken and viewed at the time trial counsel acted, it was certainly a reasonable decision on his part to ask Petitioner the question, which allowed Petitioner to explain or explain in direct evidence what he, what conversation or what statement he had with Mr. Melton about scrubbing his hands with the laundry detergent. And moreover, that Petitioner's wife, Ms. Gaines, was being threatened allegedly by this caller who made the telephone call just a few moments earlier. Can I refresh me on that? I thought that, I don't want to miss it. He asked Ms, he asked her about scrubbing the hands, right? Yes. Okay. But that, that testimony didn't, that got blocked, did it not? Well, he was asked the question. Well, I understand, but it got blocked by an objection from the DA. If I may. When Gaines was testifying on cross-examination, Petitioner's trial counsel in the first trial asked her about a conversation. There was an objection, sidebar conference, question was withdrawn. Okay. Now we go to the time when Edwards is on the stand. Exactly. That is not about the dog hand-washing, I had to kill, you know, killing thing, right? Well, Petitioner was asked by trial counsel, did you explain to your wife why you were washing your hands? And he says, yes. Or he, he says words to the effect, I was, I, I was washing my hands because the dog wet on the floor, something along those lines, without any objection from the prosecution, which shows that Petitioner was successful in getting some of these conversations in without a waiver having been found. Later on in the direct testimony of Petitioner, he testifies as to the phone call made by who apparently is Mr. Melton, where Petitioner's version is that the wife and Petitioner are both threatened. The lights go off. He's loaded a shotgun. He's standing by the window. Petitioner testifies that his wife is now screaming, what's going on? What's going on? And again, that's another marital communication coming in without any objection, without any waiver. Also, that is also a favorable piece of defense evidence, if I may. No, there was no objection. I agree. But that's then what triggered the whole motion. Well, not, not quite, Your Honor. She, he, he asked, he testifies, she was screaming, what's going on? What's going on? He's asked another question. Well, what did you tell her? I told her you were threatened, too. Or, you know, someone believes I killed the victim. We're both threatened. That's the point of the objection. Sidebar conference argument. Right. Okay. And, and just bear with me for a minute, because to me, then, the record is that the guy, I'm not saying I'm firmly in this, but accept this notion that in going through this questioning that he was going through, he, in his mind, was segmenting these episodes so that he could ask about a conversation about the dog, and that would only open up that interchange about the dog. And then he could, or if he, and then he, when he got pushed away from that, he could then go to another day, and when he's, in the episode you just talked about, now without opening up anything having to do with washing the dog and whatever she might have, that interchange might have produced, on a different day, he could, within the framework as he understood the marital privilege, he could ask about that and then just get, the most he would do would be open up a dispute about what he said to her and what she said to him on that narrow subject of why he was standing by the window. Okay, now, I understand you may not agree with, but if that were his thinking, that I can segment these conversations, and he was just dead bang wrong, and whether the law is clear or not, I mean, the court certainly seemed to think it was clear, and the deputy DA with all her authorities thought it was absolutely clear that he couldn't do it, and that was ultimately the basis on Worthington. Do we just say, look, an attorney can be screwed up like that and misunderstand the law and make a stupid tactical decision because he misunderstands the law, and that's the end of the inquiry? Well, I disagree with the language you're using there, Your Honor. There's no case that holds that counsel must be mistake-free, and certainly to the extent... No, I was closing the question, Your Honor. Well, I don't know what was going through counsel's mind at the time he was asking, but certainly based on the argument he made following the, or at the sidebar conference later the next day, he raised an argument that he could compartmentalize, and that argument was repeated by subsequent trial counsel and counsel on direct appeal. Never once was that argument found to be so frivolous that it would be considered, quote, unquote, using your word, stupid. And going back to looking at the reasonableness of counsel's conduct at the time he acted, there was certainly a benefit to be obtained by allowing petitioner to testify directly as to what he told his wife. That testimony about the threat was the only direct evidence which would explain why his wife would go to Florida on short notice, leaving her family the next day. And really, if you look at it, the arguments that I've made regarding the reasonableness of trial counsel's conduct also are fairly similar to the arguments regarding the prejudice prong, that if you were to take the confession out of the equation altogether, the evidence that we have left, albeit circumstantial, is still that petitioner had a motive to kill Mr. Thomas. Petitioner had access to weapons consistent with the murder weapons. The body was found near Petitioner's place of business. He made the verbal threat to kill Mr. Thomas. He also threatened Mr. Melton. His flight immediately after the murder can be inferred as consciousness of guilt. And even if you take out this confession evidence, which I agree is strong evidence, it still doesn't mean that the prosecution's case was so weak that there was a reasonable probability that the jury would come back with a not guilty verdict. I see I've three but the trial judges putting in the record that if he was wrong and letting it in, it was clearly prejudicial. Well, I don't recall. Well, I don't recall exactly what the second trial court said about the matter, but I do remember statements and I'm sure opposing counsel will correct me on this, but let me just read it. I don't want to put you on the spot. I would test your memories, but they were convinced that without the testimony that I allowed in that the verdict may well have been a different one so that I want to make it clear that if I'm wrong on this, I do think it's reversible from my standpoint, whatever the court of appeals wants to decide because this is a key issue. In this case, this testimony was very damaging, as you said. Your Honor, again, I don't recall the scope of the argument regarding the prejudice prong of Strickland at that time, but I would submit that that I would just submit that the trial judge was wrong in that regard. If I may, Your Honors, may I save the remaining time for rebuttal? Thank you. Good morning, Your Honors. Stephen Lutleiner for Appellee Christopher Edwards. I just want to pause and emphasize that what's at stake here. Defense counsel allowed the jury to hear the only evidence that his client had confessed to the murder that he was on trial for. The only reason the jury heard that Mr. Edwards had confessed or admitted, supposedly, the murder he was on trial for was because of what defense counsel did. Now, anyone who does this work recognizes that there are tradeoffs. When the defendant testifies, sometimes it's better to bring in the impeachment priors up front so the client's not confronted with them. Later, in a capital case where there are mental health issues on the line, you have to decide whether your mental health expert is going to go on and have to acknowledge having reviewed unsavory aspects of the client's past that might otherwise not have come in. In the Nixon case that we talked about a little this morning, there was the tradeoff of where the defense counsel did not vigorously contest guilt in the hope that some of the more inflammatory aspects of guilt would not come into the record that could ultimately be used at the penalty phase. In Mr. Thomas' case where Nixon was discussed, it sounds like there were similar issues conceding something small in order to hopefully get something big. But there are limits, and the limits were crossed here. In the Crotts case we cite, counsel was ineffective to failing to object to prior act evidence that the defendant had admitted killing a cop. Not true, but ineffective assistance nonetheless. This is worse. I want to talk a little bit about some of the procedural histories that we've gotten through. One point that I think is getting somewhat lost in the discussion is the prosecutor's objection, or series of objections, throughout the first trial are really irrelevant. She could have just sat on her hands, let defense counsel shoot himself in the foot, and then gone up to him and say, I'm going to be recalling these gains afterwards, and let's discuss why defense counsel raised or waived the privilege in numerous instances. The primary area where defense counsel first waived the privilege, and this was found both by the first trial court and by the court of appeals, was in asking the question to Mr. Edwards about whether he told his wife that he was cleaning up after the dog, and he said yes, about the dog, yes. And that was held to be the waiver. So we don't even have to get into issues about whether the question was withdrawn. No, the question to Ms. Gaines was withdrawn, and defense counsel said, oh, it's an interesting question. You might be right. But when Mr. Edwards was on the stand, he said, and he said he first elicited that Mr. Edwards was cleaning up after the dog, so it had an accident, and then said, and did you tell your wife about that? And he said yes, about the dog, yes. And that's where the waiver occurred that allowed Ms. Gaines to. The one that everybody relies on, but. Well, but, well, the trial courts went down the list of questions that defense counsel had asked about, going to see the, go see your brother, and then about the dogs, and then the question about, about what happened the night when the phone call came the following night. And the court of appeal also expressly held that the waiver occurred when defense counsel asked the question about, to Mr. Edwards, about cleaning up after the dog. Defense counsel, I submit, had a fundamental problem, not just with the scope of the marital privilege, but with the scope of relevance principles in general. Let me ask you a question. As I read the transcript, nobody had a clear understanding of what the marital privilege scope, what the scope was of the privilege. And that included the prosecutor, and it included the judge, and it included defense counsel. So when he asked for authorities, the prosecutor came in and gave him two cases on the attorney-client privilege, which defense counsel proceeded to read on the come. The district, the trial judge then said, ah, I found Weatherspoon, Weatherforth, whatever, I'm sorry, anyway, found the case that begins with a W. And the prosecutor said, yeah, I can find that referred to in Jefferson. And defense counsel's theory of that case was flat-out accurate, that it involved one conversation, that the spouse, the wife said, showed one thing and the husband said, showed another, but involved a single conversation. From that, defense counsel argued that case, it doesn't follow necessarily from that case, that if I ask one question about one conversation, I've opened the door to another. Now, that turns out to be wrong, but what about that in and of itself shows incompetence? Well, first of all, as I said, the issue is the question about, is really the question about the dogs. Defense counsel's sitting around waiting for the prosecutor to object and help him out, and the fact that she objects about the question the following night, not about the dogs, I don't think helps his situation. The dog question, Ms. Gaines was going to testify and did testify, he never said anything about that. So that brings that, if we have to fit this precisely into the Worthington paradigm, it fits when you focus on the question about the dogs. But the broader principle that defense counsel did not understand is that you do not, whether it's, whether we put it under the privilege heading or we put it under the relevance heading, that you do not get to put on your version of a disputed series of events and prevent the other side from putting on its version. And that is the basis on which the issue was argued throughout. All the prosecutor's comments at trial were premised on that theory. The judge's ruling was premised on that theory, and I'm looking at the Attorney General's opening brief in the direct appeal, and I want to read a portion that I think is significant. It's on page 1840 of the excerpts of record. When defense counsel asked Appellant in the first trial whether he had told his wife about what happened with respect to the dog making a mess in the house, Appellant responded that he had. Although in another context, this statement about cleaning up after the dog might not have been confidential, it was in the instant case because Appellant was on notice that Gaines would tell a different version of what Appellant had told her about why he was cleaning the floor, which was a confidential communication. By testifying about this subject matter, albeit in Appellant's self-serving and exculpatory version, he invited a response from Gaines to rebut Appellant's version of events. As in Worthington, Appellant should not be allowed to bolster his own defense by portraying a particular subject matter in a favorable light, only to silence his wife's contrary version of that subject matter by claiming the privilege. Now, what's noteworthy about this discussion is that they're not really talking about privilege law at all, because whether or not the statement about cleaning up after the dog is confidential doesn't change its format based on subsequent events in litigation. You'd say the statement is either confidential when it's made, it's a confidential marital communication when it's made, or it's not. What the Attorney General here is talking about is litigation posture, which is you do not get to put on your case about disputed events the way that you want to and go, ha, ha, I have a privilege that keeps the other side from putting on its version about disputed events the way it wants to, and that is the global fundamental flaw in counsel's thinking, regardless of how developed marital privilege law was at the time that this all happened. I'm sorry, I'm just going through my notes here a bit. It would have been very easy for the defense counsel to discharge his constitutional obligations under Strickland in this case. You seek a preliminary ruling. You ask for a ruling in the motion in limine when everybody's talking about this issue. The prosecutor had no trouble filing her papers detailing a whole number of conversations that may or may not have been privileged in saying this is privileged, we agree, this is privileged, we agree, this is crime-fraud exception, this is crime-fraud exception. How hard would it have been for defense counsel to say, well, here are two or three areas I want to go in? It would have been very simple. He could have done it before trial, he could have done it in the middle of trial before he asked the questions. Counsel, I'm trying to think this case through in the way, what favorable testimony could have been gotten out of the wife, and what unfavorable testimony would come in? How do you balance? Was there anything that would be favorable that would overweigh the testimony about the confession? You mean on cross-examination, or do you mean favorable testimony from Mr. Ed, more favorable testimony? How the lawyer should think about testimony from compliant and from gains. What's to be gained and what's to be lost? Well, first of all, I submit, as the district court found, focusing on Mr. Edwards' testimony, there was nothing to be gained by asking him about those two conversations. Mr. Edwards testified under oath in court, I was cleaning up after the dogs. Mr. Edwards testified under oath in court, I got a phone call, someone threatened to kill me, and so we took off. And he explained later on, elaborating on that, in the world that I live in, you know, it's not indictments and attorneys and trial by jury. It's they come after you, and if they get the wrong guy, gee, that's too bad. So he appeared for his life, and he took off. In terms of other testimony that could have been gotten from Ms. Gaines on cross, I don't think that the attorney general has pointed to any other than the possibility of somehow further discrediting her by calling her, you're a liar, he didn't really say that, did he? You're a liar, you're a liar, you have immunity, you're a liar. And that was kind of dealt with in the Dorsey case, the California opinion, where they say you do not do that, you do not waive privileges tactically so you can have the pleasure of impeaching the sponsoring witness further. Well, he was faced with pretty substantial, circumstantial evidence, and two functional equivalents of a confession. Not a confession, but two functional equivalents, because Milton testified that he said I'll, you know, F you up two. Which I think he denied. Also. But that was a semi-confession, and the second one, unexplained, would be flight, because unexplained, that's just sheer consciousness of guilt. And at the time, it was unexplained. So he, in order to get rid of at least one of those, he had to get out that they didn't flee because he did it, but rather because he and his wife were scared of a third-party threat. So faced with that, that was sort of like his only way to explain those two things. And he did explain that. He explained that they fled because they feared, because he had received that phone call. Well, sure, but that's the only way he gets that out, is to ask that question. Without that question being asked and answered, then you've just got unadorned flight. No, he testified that he received a threatening phone call, and you do not have to introduce the evidence that I told my wife someone just... Well, then there's no explanation for why she is afraid and goes with him. I mean, none. The explanation is his testimony properly shaped under oath on the stand that he received a threatening phone call by people who said, by the time he got home from Melton, presumably, that they threatened to kill me and my wife, and that's why they fled. The additional, and I told my wife, oh, somebody just called us, blah, blah, blah, is not necessary to bolster that, to bolster that evidence. It's, there are always going to be, you know, it's not a perfect divorcement between action and statements. And then this was acknowledged a little beforehand when the prosecutor filed her list of statements or conversations she was going to introduce. There was some concern that there might be, you know, implied conversations that you could weave into, into the conduct. And the Court said, no, as long as you don't go into the conversations, the privilege is upheld. Mr. Edwards did ultimately explain what, you know, his, why he fled, not just because he got the threatening phone call, but why didn't you stay home, call the police, and so on, you know, that they were going to take him out, you know, one way or the other. So I think the flight, I think the flight was explained. I disagree that the circumstantial evidence case is so strong that there can't be a finding of prejudice in this case. I think if you look. I wasn't going on prejudice. I was going on why it made it a tactical decision. Well, I don't. Because, I mean, I think you can factor in. I think we're, I personally would think you're bound by the trial judge's finding of prejudice. But, but you could factor in the same things into making the decision about whether the risk was worth taking. The risk of admitting the, of admitting the confession. I think when you think about what trial counsel normally do in cases where there's a confession on the table, they try to keep it out. If the defendant has confessed to the cops, motion to suppress, inadequate Miranda warnings. If that doesn't work, coerce confession. If that doesn't work, I don't know what. But you never see defense counsel in letting in the sole evidence of a confession for the big charge, the murder charge, that the client is on trial for. And the Hayes and the two cases I cited in the 28-J letter last week, Horton and Hayes, they're not ineffective assistance cases. But they focus on, in the, they focus on the prejudicial aspect of introducing the only, in a circumstantial evidence case, the only direct evidence that the client admitted testifying that he committed the murders or the charged crimes. I would also, I just want to talk a little bit more about the trial court rulings. Because I don't think, in a way, I don't think they're adverse. Because what the trial court rulings boil down to is defense counsel, one, wanted to help his client, and then he blundered, and he didn't know the law. And lots of attorneys who were found ineffective want to help their client. They're full of good intentions. They want to help their client, but they do not investigate the case adequately. They're ignorant of the law, or they commit other fundamental errors. So I would say on the balance of the entire State court record, the district court did not err at all in, A, finding that defense counsel was ineffective in allowing the confession to murder to come into the record, and, B, that the case on this record of circumstantial evidence was prejudicial. Unless the Court has other questions. I guess I just have one clarifying one. I wanted to be sure. You have said that I certainly was not under the impression that he had asked Edwards for the conversation between Edwards and his wife about the dogs. I can't find it. I mean, he asked, did you tell her what had happened with the dogs? And his answer is, about the dogs, yes. But he doesn't say anything about the conversation. And so I just want to know, is that what you're pointing to, just so I know? That's the portion of the record I'm pointing to, yes. That's just what I wanted to make sure. And that the trial court was, and that the court of appeal was. And that was also a waiver. Right. He had just described what happened, what he had done with the dogs, and then explained that he had. Okay. That's cool. I just wanted to be sure I found it. Okay. Yes. Thank you. Thank you, Your Honor. Your Honors, first of all, with regard to Judge Fletcher's earlier question about Ms. Gaines' testimony and what happens without the confession, without Ms. Gaines' testimony, or I should say without the confession, Ms. Gaines' testimony is completely bolstered by Petitioner's admission to participating in the insurance scam. So without the confession, her testimony becomes even more credible. And furthermore, without the confession, or without the statements about what Petitioner told her about the threat, there was nothing linking her leaving California on such short notice to the threat. She testifies she doesn't want to go. She is leaving her entire family and hadn't planned ahead of time to do so. So without that testimony from Petitioner about the conversation, all we have left is her flight, which she doesn't want to do, and it's unexplained. Other than just under these circumstances, it very strongly points to a consciousness of guilt. At that point, when she testified, they were estranged or no longer together. Is that correct? By the time of trial, yes. And was she impeached at all to try to discredit her testimony to show that she had an animosity toward him? Well, the impeachment testimony came in in the context of the privilege being waived. I understand. Because of the- Let's assume we take that out. Was she subject to being challenged as a vindictive or bitter woman? I suppose it's possible. However, before the waiver was even found, Petitioner got on the stand and copped to the fact that he participated in the insurance scam. And if the confession evidence was removed, there's nothing left for him to challenge her about being a liar or being vindictive. And one other point. She testifies as to the scrubbing the hands that Petitioner was acting weird. Well, without the testimony from Petitioner explaining he was cleaning up after the dog, there's nothing left or there's nothing for the jury to infer. I should say the jury is left in a position of Petitioner acting weird and Ms. Gaines doing nothing or testifying in no other way to explain that that conduct is normal. He didn't. He was perfectly entitled to explain what he was doing. That doesn't have anything to do with the privilege. Well, but if Ms. Gaines is credible and she's testifying that he's acting weird- Yeah. And he can testify to what he was doing, which he did. Well, yes. And stop there. I mean, that's not the- that has nothing to do with the privilege. Well, but putting- Why would he possibly want to open up and say what I said to her so she can say, oh, yeah, and here's what he told me. I mean, the point is he didn't. He did not explain on the stand what he told her about washing his hands. He explained what he did. Well, but the jury's left looking at this at the wife to say- Okay. I just don't understand the point. Well, and if I may just- If I may, one last- Your time has expired, so if you just wrap up. Well, I was- Without equal. I was just going to say, Judge Reimer, you had mentioned two confessions, one being the flight, one being the threat. He also threatened to kill Mr. Thomas. There was that evidence, too. So three confessions other than- Okay. Anyway, thank you, Your Honor. Thank you. Thank you.
judges: B. Fletcher, Rymer, Fisher